<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
:
S.S., o/b/o N.S., a minor child,                    :
                                                    :       Civil Action No. 3:14-cv-6607-BRM-LHG
                    Plaintiff,                      :
                                                    :
        v.                                          :
                                                    :
                                                    :           **OPINION**
BRICK TOWNSHIP SCHOOL                               :
DISTRICT BOARD OF EDUCATION,                        :
NEW JERSEY DEPARTMENT OF                            :
EDUCATION, CHRISTOPHER CERF                         :
AND DAVID HESPE, ACTING                             :
COMMISSIONERS OF NEW JERSEY                         :
DEPARTMENT OF EDUCATION, DR.                        :
WALTER USZENSKI, INDIVIDUALLY                       :
AND IN HIS OFFICIAL CAPACITY                        :
AS SUPERINTENDENT OF SCHOOL,                        :
ANDREW J. MORGAN,                                   :
INDIVIDUALLY AND IN HIS                             :
OFFICIAL CAPACITY AS AUDITOR,                       :
DISTRICT CONSULTANT, AND                            :
INTERIM DIRECTOR OF SPECIAL                         :
SERVICES, SUSAN RUSSELL,                            :
INDIVIDUALLY AND AS DIRECTOR                        :
OF SPECIAL SERVICES, and JOHN                       :
DOES 1-100, INDIVIDUALLY AND                        :
IN THEIR OFFICIAL CAPACITIES,                       :
                                                    :
                    Defendants.                     :
_____:

**MARTINOTTI, DISTRICT JUDGE**

        Before this Court is: (1) a Motion by S.S., on behalf of N.S. ("Plaintiff") for Summary

Judgment (ECF No. 113) and (2) a Motion by Brick Township School District ("Brick" or the

"District") and Susan Russell, Individually and as Director of Special Services ("Defendant

Russell") (collectively "Defendants") for Partial Summary Judgment (ECF No. 114). Defendants filed an Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 118) and Plaintiff filed an Opposition to Defendants' Motion for Partial Summary Judgment (ECF No. 117). Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendants' Motion for Summary Judgment is **DENIED**.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

S.S. is the parent of N.S., who is currently 21 years old and has been diagnosed with autism. (ECF No. 44 ¶ 6.)[1] N.S. was enrolled at Brick Township Memorial High School ("BTMHS") for ninth grade, in the 2012-2013 academic year, and then at Brick Township High School ("BTHS") for tenth grade, in the 2013-2014 academic year. (ECF No. 44 ¶ 17.) Prior to high school, N.S. was enrolled in an LLD-M (Learning Language Disability-Mild) program at Veterans Memorial Middle School ("VMMS") in Brick. (*Id.*)

On May 31, 2012, the middle school child study team at VMMS completed an IEP of N.S. (the "May 2012 IEP") in which it was recommended that N.S. continue in the self-contained LLD-M class. (ECF No. 114-4, Ex. B.) The May 2012 IEP recommended speech therapy three times per week, occupational therapy three times per week, and supplemental instruction for three hours per week. (*Id.*) Furthermore, the May 2012 IEP scheduled a meeting to be held sixty days after N.S. started the program. (*Id.*) On November 12, 2012, S.S. was sent a "Request for Parental Participation in a Meeting," requesting participation in the sixty-day

---

[1] At all times relevant, N.S. qualified as a "child with a disability" pursuant to 20 U.S.C. § 1401 and was therefore eligible for special education services from Brick through an Individualized Education Plan ("IEP").

follow-up meeting, planned for November 30, 2012. (ECF No. 114-4, Ex. C.)

Plaintiff claims that, on October 9, 2012, S.S. received a "revised IEP" (the "October 2012 IEP") which again confirmed N.S.'s placement in the LLD-M class. (ECF No. 113-1 ¶ 5.) Plaintiff contends the October 2012 IEP "superseded the May 2012 IEP and the October 2012 IEP was to be implemented for the 2012-13 school year." (*Id.*) Plaintiff further notes Defendants do not discuss the October 2012 IEP, and that it was not considered by the Administrative Law Judge ("ALJ") in the Due Process Hearing. (July 29, 2014 ALJ Decision (ECF No. 113-4).) The October 2012 IEP is identical to the May 2012 IEP. (ECF No. 114-4, Ex. B; ECF No. 101, Exs. 2 & 3.)[2]

On November 30, 2012, N.S.'s sixty-day review was held, which was attended by S.S. and several individuals from BTMHS, including social workers and teachers. (ECF No. 114-4, Ex. C; November 2012 IEP (ECF No. 114-4, Ex. D).) S.S. testified that she did not know that the purpose of the meeting was to discuss modifications to N.S.'s IEP. (ECF No. 113, Ex. C, 29:4-12; 155:21-156:8.) S.S. left the sixty-day review "abruptly" before it concluded. (ECF No. 113-1 ¶ 12; ECF No. 114-1 ¶ 12.) At the conclusion of the sixty-day review, Brick drafted an IEP dated November 30, 2012 (the "November 2012 IEP") with an implementation start date of December 1, 2012. (ECF No. 114-4, Ex. D.) Pursuant to the November 2012 IEP, N.S. remained in the LLD-M class with the same teacher. (ECF No. 113, Ex. A at 41.) The November 2012 IEP was generated despite the lack of a written notification specifying that the sixty-day review was an "IEP meeting." (*Id.*) Furthermore, there was no sign-in sheet at the sixty-day meeting and S.S. did not receive a copy of the amended IEP with a notice of a right to object within fifteen days,

---

[2] Plaintiffs apparently argue the "October 2012 IEP" is separate and distinct from the May 2012 IEP merely because they were sent a "revised" copy on October 9, 2012. (ECF No. 113-1 ¶ 5.) However, these IEPs have the same effective date and are identical. (ECF No. 101, Exs. 2 & 3.)

as required by law. (*Id.*)

The November 2012 IEP stated, in pertinent part:

> As of November 26, 2012, [N.S.] is making satisfactory progress regarding his social skills and life skills. However, academically [N.S.] is making limited progress.
>
> . . .
>
> Although [N.S.] tries, he is having tremendous difficulty following along/understanding material being taught within the learning environment. . . . N.S. struggles creating sentences that display his knowledge. Assessing [N.S.] proves to be difficult. His learning disability is understood; however, within an academic program he must be accountable for the information.
>
> . . .
>
> At this point in time, I cannot guarantee that [N.S.] will pass his academic courses for the year.
>
> . . .
>
> I absolutely adore [N.S.] However, it is my professional opinion that I cannot meet his learning needs within this environment. I feel as though the modifications and material he requires are not appropriate for this program.

(ECF No. 114-4, Ex. D.)

The November 2012 IEP differed slightly from the May 2012 IEP. The November 2012 IEP "added program goals but did not actually change N.S.'s individual goals and objectives, though the wording was different." (*Id.*) Additionally, the November 2012 IEP had slightly different academic goals than the May 2012 IEP, especially with respect to content. (ECF No. 144-4, Exs. B & D.) For instance, the May 2012 IEP had the following goals, among others, for N.S. in ninth grade science class:

> Earth: Recognize plate tectonics and explain the relationships in earthquakes and volcanoes. Incorporate understanding plate tectonics and their mechanism. Recognize the chemical

composition of the Earth. Relate the atmosphere, climate, and weather relative to energy. Correlate the interrelationship of the atmosphere, geosphere, and hydrosphere. Explain the water cycle. Describe the ozone and contributory factors. Know and recognize the weather symbols.

(ECF No. 114-4, Ex. B at 118.)

Meanwhile, the November 2012 IEP had differing objectives from the May 2012 IEP, listing, *inter alia*, N.S.'s science goals for the 2012-2013 school year as follows:

Predict what would happen to an ecosystem if the energy source was removed. Explain the difference between a food chain and a food web. Briefly describe and explain the Greenhouse Effect. Explain how energy is transferred between organisms in a food pyramid, food chain, and food web. Explain the factors that limit population size. Explain the difference between a consumer and a producer. Name pollutants, their sources, and their effects on humans.

(ECF No. 114-4, Ex. D at 149-50.)

The November 2012 IEP, like the May 2012 IEP, provided N.S. with the same special education services for the several subjects. (ECF No. 114-4, Exs. B & D.)

On April 25, 2013, Crystal Badders ("Badders"), a social worker at BTMHS and N.S.'s case worker at BTMHS, sent an email to Marjorie Eckhoff indicating that "per the directive given by Donna Stump [("Stump")], Director of Social Services, supplemental instruction in the district will be terminated as of Tuesday April 30, 2013." (ECF No. 113, Ex. D.) Plaintiff contends this decision conflicted with the May 2012 IEP and the November 2012 IEP, both of which call for supplemental instruction for N.S. (ECF No. 113-1 ¶ 28.)

Plaintiff argues that, "[i]n lieu of giving N.S. failing grades for the 2012-2013 school year, N.S.'s teachers drafted narratives instead." (ECF No. 113-1 ¶ 30.) Plaintiff notes these narratives "were not considered by ALJ Bingham during the Due Process hearing." (ECF No. 113-1 ¶ 31.) For example, Courtney Arre, one of N.S.'s special education teachers, provided the

following statement in lieu of a letter grade:

> [N.S.] did not meet course requirements in order to receive a final grade average for his Social Studies course. [N.S.] also did not meet his level of mastery for his Social Studies goals for the 2012-2013 school year. . . . It is my professional opinion that this type of learning environment is a detriment to [N.S.'s] educational success and emotional wellbeing. The current academic placement seems to be harmful to his education. It is extremely heartbreaking to see [N.S.] struggle with the material on a daily basis. Even though [N.S.] has made limited progress socially, it is my professional opinion that [N.S.] should be in a classroom environment, where social/life skills and community based learning services are emphasized daily.

(ECF No. 101, Ex. 8).

Similarly, Nicole Pannucci ("Pannucci"), a Brick special education teacher who taught N.S. in the LLD program, provided the following narrative in lieu of a letter grade:

> It is within my professional opinion that [N.S.] did not meet course requirements to pass Science, English and Math, for the school year. Throughout the school year he had tremendous difficulty following along/understanding material being taught within this learning environment. The volume of material, the content of the material and the pace at which the class moves is too intense for him . . . Several testing accommodations (several are not included in his IEP) were provided . . . It is my professional opinion that I cannot meet his learning needs within this environment . . . Curricula and assessments can be modified . . . but the integrity of the material, the course, and the program must be maintained and within an academic group [N.S.] has to be accountable for the information . . . I feel as though this program is doing more harm to [N.S.] than good . . . It is my professional opinion, based on [N.S.'s] ability, he is inappropriately placed.

(ECF No. 101, Ex. 8.)

Despite the explanations of unsatisfactory work provided by N.S.'s instructors, S.S. eventually received a transcript indicating passing marks for N.S. in the 2012-2013 school year. (ECF No. 113, Ex. A at 42.)

On May 28, 2013, Brick held an IEP meeting to discuss N.S.'s program and placement

for the 2013-2014 school year. (ECF No. 114-4, Ex. E.) This meeting was mandated by the November 2012 IEP. (ECF No. 114-4, Ex. D.) On May 14, 2013, S.S. sent an email to Badders and Stump indicating that she was unable to attend an IEP meeting on May 28, 2013 and that she preferred not to have Defendant Andrew Morgan ("Defendant Morgan") present at the meeting. (ECF No. 113, Ex. F at 1.) S.S. claims she "did not want to meet with [Defendant] Morgan without her husband present because of all the threats he had made and his abuse of her," but provides no evidence of such threats nor any evidence that she informed Brick of such. (ECF No. 113-1 ¶ 40.) On May 17, 2013, Badders replied to S.S.'s email confirming that the May 2013 IEP meeting would be held on May 28, 2013, stating, "Since the original meeting date of Thursday 5/30/13 at 12:15pm was rescheduled as per your request, the meeting scheduled for 5/28/13 at 1:00pm is second notice." (*Id.*) Defendants contend the "District appropriately provided S.S. with written notice of the May 28, 2013 IEP meeting" and that "[d]espite said notice, S.S. chose not to attend" the meeting. (ECF No. 114-1 ¶ 18.)

At the May 28, 2013 IEP meeting, the child study team discussed N.S.'s overall academic progress as well as his difficulties during the 2012-2013 academic year. (ECF No. 114-4, Ex. E.) Ultimately, the team drafted an IEP (the "May 2013 IEP") which concluded, among other things, that N.S. attend a Multiply Disabled class ("MD") at BTHS for the 2013-2014 school year, that N.S. be provided with a shared paraprofessional for guidance and support, that N.S. attend thirty minute speech and language services twice a week, that N.S. attend occupational therapy for thirty minutes twice a week, that N.S. attend group counseling once a week for thirty minutes per session, that N.S. be given access to "assistive technology," and that N.S. participate in the in-District Extended School Year Program and Social Skills Group ("ESY"). (ECF No. 114-4, Ex. E at 174-209.)

On June 3, 2013, Plaintiff received a Parental Notice of Completed IEP from Brick pertaining to the May 2013 IEP. (ECF No. 113, Ex. H.) A copy of the May 2013 IEP was attached to the notice, however, Plaintiff was not informed of the right to file for due process or provided with the "Parental Rights in Special Education" handbook. (*Id.*)

On June 17, 2013, Brick held a reevaluation planning meeting concerning the May 2013 IEP, which S.S. attended. (ECF No. 114-5, Ex. L.) At the June 17, 2013 meeting, the child study team proposed conducting educational, psychological, and assistive technology evaluations upon N.S. (*Id.*)

On June 18, 2013, Plaintiff filed a Petition for Due Process and Request for Emergent Relief (the "Petition") with the State of New Jersey's Office of Special Education ("OES") against Brick. (ECF No. 114-5, Ex. M.) Specifically, the Petition challenged the May 2013 IEP, N.S.'s proposed placement for the 2013-2014 academic year, and the program provided to N.S. for the 2012-2013 academic year. (*Id.*)

On July 1, 2013, the parties appeared for an Emergent Relief Hearing before the Hon. Susan M. Scarola, A.L.J., at the Office of Administrative Law ("OAL") in Mercerville, New Jersey. (ECF No. 114-5, Ex. N.) On the same date, the parties entered into a settlement agreement, which provided:

> ON THIS 1ST DAY OF JULY, 2013, IN FULL RESOLUTION OF THE EMERGENT RELIEF REQUEST FILED BY THE PARENT IN THIS MATTER, THE PARTIES HEREBY AGREE AS FOLLOWS:
>
> 1) N.S. WILL ATTEND THE "PIC" PROGRAM FOR THE SUMMER OF 2013. THE PROGRAM RUNS FROM JULY 8, 2013, THROUGH AUGUST 16, 2013, AT [BTHS], MONDAY THROUGH THURSDAY FROM 8 A.M. TO 2:30 P.M. THE PARTIES UNDERSTAND THAT THE "PIC" PROGRAM IS RUN BY THE COUNTY OF OCEAN, AND THE DISTRICT HAS NO OVERSIGHT OR RESPONSIBILITY RELATIVE TO

THE PROGRAM . . . IF FOR ANY REASON N.S. IS TERMINATION FROM OR BECOMES UNABLE TO ATTEND THE "PIC" PROGRAM, UNDER NO CIRCUMSTANCES WILL THE "PIC" PROGRAM BE CONSIDERED "STAY PUT." IN THE EVENT OF SUCH TERMINATION, N.S.'S "STAY PUT" PROGRAM FOR ESY 2013 WILL BE THE BEADLESTON PROGRAM AT [BTMHS]. THE PARENT WILL BE RESPONSIBLE FOR TRANSPORTATION FOR THE "PIC" PROGRAM

2) THE PARTIES ALSO AGREE THAT ALL SUPPELEMENTAL INSTRUCTION, PROSPECTIVE AND RETROACTIVE, IS HEREBY DISCONTINUED. UNDER NO CIRCUMSTANCES WILL THE PARENT OR N.S. HAVE "STAY PUT" RIGHTS TO ANY SUPPLEMENTAL INSTRUCTION PREVIOUSLY PROVIDED TO N.S. THROUGH THE SUMMER OF 2013.

3) THE PARTIES AGREE THAT THE DISTRICT WILL CONDUCT EDUCATIONAL AND PSYCHOLOGICAL EVALUATIONS OF N.S. IN JULY OF 2013. ONCE THE EVALUATIONS ARE COMPLETED, A JOINT ELIGIBILITY AND IEP MEETING WILL BE HELD TO DISCUSS THE RESULTS OF THE EVALUATIONS, AS WELL AS A PROPOSED PROGRAM AND PLACEMENT FOR THE 2013-2014 SCHOOL YEAR. UPON SELECTION OF A PROGRAM AND PLACEMENT FOR N.S. FOR THE 2013-2014 SCHOOL YEAR, THE DISTRICT AGREES TO CONDUCT AN ASSISTIVE TECHNOLOGY EVALUATION OF N.S.

4) THE DISTRICT UNDERSTANDS THAT RUGBY SCHOOL REQUIRES THAT THE DISTRICT FACILITATE PARENTAL VISITS. AS THE PARENT WOULD LIKE TO VISIT RUGBY SCHOOL, THE DISTRICT AGREES TO FACILITATE THE VISIT. HOWEVER, UNDER NO CIRCUMSTANCES WILL THE DISTRICT'S FACILITATION OF SUCH A VISIT BE CONSIDERED AGREEMENT WITH, ENDORSEMENT OF, OR A RECOMMENDATION OF SUCH PROGRAM.

(*Id.*)

Judge Scarola approved the settlement agreement on July 1, 2013. (*Id.*)

The educational and psychological evaluation of N.S., as referenced in the July 1, 2013

settlement agreement before Judge Scarola, were completed in July 2013. (ECF No. 114-5, Exs.

O, P.) Defendants claim that, on August 12, 2013, pursuant to Judge Scarola's "Decision Approving Settlement," the parties held an IEP meeting. (ECF No. 114-1 ¶¶ 29-31.) Defendants provide no evidence of such meeting, but only a "Modified Stay Daily Schedule" which was apparently developed for N.S. (ECF No. 114-5, Ex. Q.)[3]

Plaintiff contends that in September 2013, "under threats and bullying by Defendant Morgan," they "reluctantly agreed to a temporary interim placement pending a Due Process Hearing" whereby N.S. would be in the MD class for part of the school day and in vocational and other skills trainings for the remainder of the day. (ECF No. 113-1 ¶ 46.) As evidence of these alleged threats and this agreement, Plaintiff cites only to her own testimony that she was "threatened by [Defendant] Morgan" and that he "screamed at her many times," among other things. (ECF No. 113, Ex. C, 93:23-95:11.)

Between August and November 2013, Plaintiff filed various emergent motions, as well as a Motion for Summary Decision, in connection with their application for Due Process. (ECF No. 113-1 ¶ 51; ECF No. 114-1 ¶ 33.) On December 5, 2013, the Hon. Patricia Kerins, A.L.J., issued an Order on Emergent Relief and Motion For Summary Decision holding, *inter alia*: the terms of the May 2013 IEP should be enforced; the stay-put program and placement in effect in the May 2013 IEP should be enforced; N.S. is to be put in the LLD class at BTHS; S.S. is to be provided N.S.'s grades from the 2012-2013 academic year; and S.S. is to be allowed access to N.S.'s teachers and District staff to the same extent as all other parents. (ECF No. 113, Ex. J.) Judge

---

[3] Defendants further contend that, on August 13, 2013, District personnel met to discuss the August 12, 2013 IEP meeting, S.S. disagreed with the proposed program established for N.S., and counsel for both sides "exchanged multiple e-mails between mid-August and September 12, 2013 in furtherance of reaching a compromise" on a modified stay-put program for N.S. for the 2013-2014 academic year. (ECF No. 114-1 ¶¶ 29-31.) Again, Defendants provide no evidence to support these contentions and cite only to the Modified Daily Schedule established for N.S.

Kerins' decision also denied Plaintiff's Motion for Summary Decision without prejudice. (*Id.*)

On January 27, 2014, Judge Kerins recused herself from the matter and it was assigned to the Hon. Robert Bingham, II, A.L.J. (ECF No. 114-5, Ex. R at 2.) On February 4, 2014, Plaintiff filed an omnibus motion requesting an Order to: modify the stay-put; to enforce Judge Kerins' Order; and to compel Brick to allow S.S.'s expert to observe the proposed placement. (*Id.*) On March 19, 2014, Judge Bingham denied Plaintiff's motion in all respects except with regard to her request that her expert be permitted to observe the proposed placement. (*Id.*)

The Due Process hearing began before Judge Bingham on May 22, 2014. (*Id.*) The hearing lasted fourteen days with testimony taken on the following dates: May 22, 2014; May 29, 2014; May 30, 2014; June 2, 2014; June 5, 2014; June 13, 2014; June 17, 2014; and June 25, 2014. (*Id.* at 3.) The following individuals testified at the Due Process hearing: S.S.; Nicholas Krupinski, the school psychologist; Susan Winward, a special education teacher; Defendant Morgan, Brick's Auditor for Special Education; Dr. Danielle Chase, N.S.'s neuropsychologist; Peter Panuska, Assistant Principal at BTHS; Pannucci; Darla Novick, BTHS's SLE coordinator; Karen Morrison, a special education teacher; Susan Soltys, a special education teacher; and Stump, BTHS's Supervisor of Special Education. (*Id.* at 52-58.)[4]

On July 29, 2014, Judge Bingham issued a written decision concerning Plaintiff's Due

---

[4] Furthermore, Judge Bingham also considered the following exhibits, *inter alia*, in rendering the opinion: the May 2012 IEP; the request for parental participation in the sixty-day review meeting, dated November 30, 2012; the November 2012 IEP; the request for parental participation in the sixty-day review meeting, dated May 7, 2013; the May 2013 IEP; a child study team speech evaluation, dated May 23, 2013; a child study team psychological evaluation, dated July 15-16, 2013; a child study team "brief" psychological evaluation, dated August 12, 2013; a child study team educational evaluation, dated July 10, 2013; Judge Scarola's July 1, 2013 Order and the accompanying settlement agreement; various correspondences between S.S. and Badders; the parental notice of a completed IEP, dated June 3, 2013; N.S.'s report cards and progress reports from the 2012-2013 academic year; the Brick Assistive Technology Evaluation Referral Form, dated May 1, 2013; various classwork from the stay-put program; and various email correspondences between the parties. (ECF No. 114-5, Ex. R at 52-81.)

Process Petition, determining: (1) Brick proved, by a preponderance of the credible evidence, that the IEPs and proposed IEPs for the 2012-2013 and 2013-2014 academic years provided a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"); and (2) although Brick committed minor procedural violations, those violations did not rise to the level of denying N.S. a FAPE in the LRE. (*Id.* at 58-81.) Specifically, Judge Bingham held that Brick failed to provide Plaintiff with adequate notice of the sixty-day review, stating:

> The November 2012 IEP was an amended IEP, as it altered the wording of the goals and objectives in the May 2012 IEP and added relative services. The November [2012] IEP . . . states that it was developed "as a result of an amendment" pursuant to a sixty-day review. Whether it was developed at an "IEP team meeting" is less clear. However, because the pre-meeting parental notice and IEP itself reflected that the meeting was for a sixty-day review of the IEP, it appears that the IEP was not amended at a "team meeting," and thus, parental consent is required by the IDEA, the Federal Code and New Jersey's regulations. [S.S.] did not receive a copy of the amended IEP and notice of the right to object within the required fifteen days as required by N.J.A.C. 6A:14-3.7(d)(1), (2). Thus, procedurally, the amendment of the May 2012 IEP by way of the November 2012 IEP was defective.

(ECF No. 114-5, Ex. R at 74.)

Nevertheless, Judge Bingham held that the procedural defects in the implementation of the November 2012 IEP did not prejudice Plaintiff, and accordingly concluded that N.S. was not denied a FAPE in the LRE, explaining:

> But again, [S.S.] had a meaningful opportunity to participate in the decision-making process at the November 2012 meeting, preceded by a meeting with Ms. Stump just days earlier and followed by three to five meetings between December 2012 and March 2013 with Ms. Stump, Ms. Badders, and Ms. Anderson. Indeed, the program and placement that she preferred were maintained by the District . . . [T]he testimony indicates that [S.S.]'s ability to meaningfully participate in the IEP process was not significantly impeded. And there is no evidence that it interfered with N.S.'s right to FAPE or caused a deprivation of educational benefits.

The remaining question is whether implementation of the amended IEP denied N.S. FAPE. On that point, the November 2012 IEP was reasonably calculated to provide N.S. with FAPE. It did not change N.S.'s educational program or placement, and he remained in Ms. Pannucci's LLD-M class at BTMHS. It provided for a shared personal aide, three hours of supplemental instruction, utilization of an iPod and talking photo album, and access to "Bookshare." Although the amended IEP added "program goals" and worded individual goals and objectives differently, the goals implemented did not increase the difficulty of instructional material for N.S. Because the May 2012 IEP conferred a meaningful educational benefit to NS., and the amended IEP did not deviate from that IEP in any way that adversely impacted N.S.'s education, the November 2012 IEP did not deny N.S. FAPE.

Therefore, I **CONCLUDE** that the District's unilateral altering of the wording of the goals and objectives in the November 2012 IEP, along with the addition of related services, constituted a procedural violation, because [S.S.] was not provided with a copy of the amended IEP; however, neither the amendment of the IEP nor the implementation of the amended IEP rise to the level of denying N.S. FAPE.

(*Id.* at 74-75.)

Plaintiffs contend Judge Bingham failed to consider many pieces of evidence they attempted to introduce, whereas this Court has allowed the introduction of such evidence. (ECF No. 113-1 ¶¶ 54-56.) Specifically, Plaintiff highlights that Judge Bingham declined to consider the narratives drafted by N.S.'s teachers, in lieu of failing grades, and letters from one of N.S.'s neurologists and psychiatrists, Dr. Matthew Pitera, regarding his condition and placement. (*Id.*) Dr. Pitera's letter, dated October 4, 2013, stated in pertinent part:

> [N.S.]'s current academic plan is not one that is allowing [N.S.] to achieve to his cognitive potential. [N.S.]'s current placement in an MD/Severe setting isolates him in a separate wing in the school with a population with more severe behavioral disabilities than [N.S.] is or has ever been afflicted with. An exposure to regular ed students would benefit [N.S.] in terms of further development of his interpersonal skills and age appropriate coping strategies. [N.S.] would benefit from peer modeling with general education students, as in the past, upon exposure to children with behavior

issues [N.S.] would have a tendency to acquire those negative behaviors. [N.S.]'s mother has reported that in the past month, [N.S.] has begun mumbling to himself. It is my opinion that this is a coping mechanism for stress.

. . .

The only alternative offered over this current programming was to put back in last year's placement, an LLD Self Contained setting. It should be noted in this setting last year, [N.S.] failed every academic subject. Our concerns regarding his failure is that it was not necessarily a reflection of [N.S.]'s abilities, but rather the school not following the IEP that was put in place for [N.S.]

. . .

In my professional opinion, [N.S.] has mastered basic life skills of cooking, cleaning, organizing, household chores, self-care, and maintenance. He requires a structured vocationally oriented school program . . . that provides appropriate small group or one to one learning . . . peer modeling . . . that meets his emotional needs . . . [and] augmentative technology to assist with speech.

. . .

[h]is academic skills have been frustrated and hindered by his lack of appropriate academics all year . . . last year's placement was not effective for [N.S.], and this year's placement is proving the same. Based on the school records, full knowledge of [N.S.]'s cognitive, social, emotional, and physical development for several years, my recommendation for out of district placement is based on the district's inability to provide an appropriate learning experience for this child [and] I believe that [N.S.] would benefit from an out of district placement in a school that can address and meet all of his needs. I anticipate the District's compliance with this request as clearly an in district placement is not meeting this child's needs.

(ECF No. 101, Ex. 26 at 3-4.)

On November 20, 2013, Dr. Pitera issued a second report again concluding that N.S.'s

placement was inappropriate, stating:

It is important to note that [N.S.] is Autistic and not a multi-disabled child. It is my professional opinion that due to this current inappropriate placement, socially and academically, [N.S.] is

suffing . . . [N.S.] needs exposure to general education peers and to core content curriculum to teach him appropriate socially acceptable behaviors as well as academics in areas of interest to him such as science.

. . .

In my professional opinion, if [N.S.] remains in this inappropriate educational placement, he will suffer irreparable harm emotionally, socially, and academically.

(ECF No. 101, Ex. 26 at 5.)

Finally, Plaintiff has presented evidence of alleged misconduct on the part of Defendants Morgan and Uszenski which Judge Bingham also declined to consider in rendering his opinion. On September 29, 2015, Defendant Morgan was indicted by the Ocean County Prosecutor's Office ("OCPO") for false swearing, theft by deception, conspiracy, and official misconduct. (ECF No. 101, Ex. 37.) Defendant Uszenski was also charged with official misconduct, with the charges stemming from the alleged orchestration between Defendants Morgan and Uszenski to effectuate a fraudulent IEP for Defendant Uszenski's grandson. (*Id.*) Defendants Morgan and Uszenski were also charged with "engag[ing] in official misconduct to remove programs from IEP's contrary to the provisions of N.J.S.A. 2C:30-2 and N.J.S.A. 2C:2-6," however, this charge was later dismissed. (*Id.*)[5] Additionally, the OCPO's Application in Support of an Affidavit for Defendant Morgan's arrest warrant indicates that Defendant Morgan provided false information concerning his past criminal conviction – a Class B felony in New York for sale of a controlled dangerous substance – in order to obtain his position as "Interim Director of Special Services"

---

[5] Other official misconduct charges are still pending against Defendants Morgan and Uszenski as well as against Lorraine Morgan and Jacqueline Halsey. (ECF No. 101, Ex. 45.)

with Brick. (ECF No. 101, Ex. 39 at 1252-53.)[6]

Plaintiff contends "search warrants alleged that [Defendant] Morgan manipulated students' IEP's, including N.S.'s IEP" (ECF No. 113-1 ¶ 112), however, Plaintiff provides no evidence of such manipulation. Plaintiff further contends that several school staff members – including school psychologist Vincent Balestrieri, bus driver Barbara Burke, school psychologist Dana Gonzalez, and Stump – provided statements describing how they were "fearful of [Defendant] Morgan" and that Defendant Morgan "ordered them to change services for students and to manipulate IEP's." (ECF No. 113-1 ¶ 129.) While the aforementioned staffers did provide statements about their fear of Defendant Morgan, they indicated only that they were ordered to tamper with the IEP of one student, Defendant Uszenski's grandson. (ECF No. 101, Ex. 43 at 1296-1415.)[7]

On November 12, 2013, Defendant Morgan tendered a letter resigning his position with Brick, effective on December 31, 2013. (ECF No. 101, Ex. 42 at 1125-26.) Defendant Morgan lists health reasons as the grounds for his resignation and notes one of his accomplishments to be the "[e]limination of arbitrary and on-going tutoring," which he maintains saved Brick over $100,000. (ECF No. 101, Ex. 42 at 1125.)

Defendant Susan Russell ("Defendant Russell") also provided a statement to the OCPO in connection with its investigation of Defendants Morgan and Uszenski. This statement was not

---

[6] Furthermore, on March 7, 2013, the New Jersey Department of Education sent a letter to Brick advising the school district that Defendant Morgan "was found ineligible to hold an educational support position because a fingerprint search through the New Jersey State Police and Federal Bureau of Investigation revealed that [Defendant Morgan] had a criminal conviction for a crime considered to be disqualifying in nature." (ECF No. 101, Ex. 44 at 1467-68.)

[7] Citing Stump's statement to the OCPO (ECF No. 101, Ex. 44 at 1499-1503), Plaintiff further contends "when [Stump] was asked about an amendment to N.S.'s IEP, 'Is it fair to say that it's fraudulent?' She responded, 'Yes.'" (ECF No. 113-1 ¶ 137.) This is incorrect. The record clearly indicates the question was in reference to the IEP of Defendant Uszenski's grandson, not N.S.

considered by the ALJ. Defendant Russell lamented that making "across the board cuts" to special education programs in IEPs is illegal, "especially if it's [for] cost saving reasons." (ECF No. 101, Ex. 44 at 1608.) Defendant Russell was referring to Defendant Morgan's elimination of certain supplemental instruction programs. (*Id.* at 1605-08.) Defendant Russell further conceded that supplemental instruction is "absolutely" necessary in effectuating an appropriate IEP for a child. (*Id.* at 1608-09.)

Toward the end of her statement to the OCPO, Defendant Russell provided specifics as to how Defendant Morgan's elimination of supplemental instruction impacted N.S., his grades for the 2012-2013 academic year, and his IEPs. The transcript reads, in pertinent part:

> Assistant Prosecutor Michel Paulus ("MP"): You're . . . you're familiar with [N.S.]?
>
> Defendant Russell ("SR"): Very familiar.
>
> MP: Ok that . . . that's a case that went to due process?
>
> SR: Yes it did.
>
> MP: Ok
>
> SR: Due to the supplemental [instruction elimination].
>
> MP: Ok what happened. Explain[] that to us.
>
> SR: What happened was [S.S.] was very very upset that [Defendant Morgan] took the supplemental out.
>
> MP: With . . . without regard . . .
>
> SR: Without regard for [N.S.] or anything to do with him.
>
> MP: Was . . . was there an evaluation of [N.S.]'s situations, needs in his IEP and how he was progressing before these, these changes were made?
>
> SR: No because [before the elimination of supplemental instruction] . . . [N.S.] was place[d] in a higher level class that [] he

was able to handle.

. . .

SR: . . . [P]rior to the summer of 2012, it was recommended by the child study team that [N.S.] go to the Brick High School program which was the life skills, which is what I was explaining to you. It's called the West Wing program.

MP: Mmm hmm

SR: Absolutely didn't want it, no no no . . . and [S.S.]'s always gotten what she wanted, true from prior Directors, so [Stump] also allowed [S.S.] to run [inaudible] and so [S.S.] allowed [N.S.] to go to Brick Memorial High School to the LED program which is a higher level.

. . .

MP: I want to ask you about what you reported to us as far as [Defendant Morgan] making an effort to change [N.S.]'s grades.

SR: Yes, all year long there were . . . there were multiple meetings with [S.S.] about [N.S.] with the teachers and the supplemental instructor happened to be his . . . was . . . was a had been doing this for quite some time with [N.S.] I don't recall how many years but it's been done for a number of years that the same supplemental instructor provided supplementary instruction to [N.S.] like twice a week. Gearing him up for tests, helping him study, org . . . color coding things because he was . . . his IQ was 48 so he really wasn't capable of . . .

MP: Was he benefitting from supplemental instruction?

SR: I'm not really sure you can call it benefitting from it.

. . .

SR: [Eventually,] supplemental [instruction] was taken out, [S.S.] said, "you know what, no it's not." Then she met with [Defendant Morgan] and [Defendant Morgan] said, "well we'll let it go through May." So [Defendant Morgan], you know, even though everyone else got it taken out, he said "ok well for [S.S.], we're going to let it go through May." So we let it go maybe another three weeks of two hours a week. [S.S.] still was not satisfied and they had a lot of verbal altercations between the two of them,

[Defendant Morgan] and [S.S.]

. . .

SR: A lot of verbal altercations and so at the end of the year, there was an IEP meeting held . . . .

MP: At that point, you go forward with an IEP, there's just no parent input?

SR: No parental . . . yes.

. . .

MP: What if anything did [Defendant Morgan] do after the filing with respect to N.S.'s grades?

SR: [Defendant Morgan] asked me to, he directed me, to direct the teachers. First he told me the teachers to write a narrative because they couldn't . . . they couldn't be assessed by grades, I do have e-mails to show you.

. . .

MP: What was it that you told us about [Defendant Morgan]'s effort to compel the teachers to give him . . . .

SR: So at the end of the year, after [Defendant Morgan] told them to do that narrative, then he rescinded that and said, "no, now I want you to put letter grades in" and they wrote e-mails and said, no I'm not comfortable putting letter grades in and my narrative will suffice and I will not put letter grades in.

MP: Ok so what happened?

SR: The transcript was generated in September and there were letter grades in.

MP: Ok.

SR: They were 70's.

. . .

MP: So he didn't just ask for letter grades he asked for passing letter grades?

SR: 70's, he wanted 70's.

(ECF No. 101, Ex. 44 at 1643-49).

On October 24, 2014, Plaintiff filed a Complaint against Defendants Brick, Christopher Cerf ("Defendant Cerf"), David Hespe ("Defendant Hespe"), Defendant Morgan, the New Jersey Department of Education ("NJDOE"), Defendant Russell, and Dr. Walter Uszenski ("Defendant Uszenski"). (ECF No. 1.) On February 2, 2016, Plaintiffs filed their Amended Complaint (the "Amended Complaint") in this matter asserting, *inter alia*, violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1504, *et seq*. against Defendants. (ECF No. 44.)[8] On March 29, 2018, this Court issued an Opinion and Order allowing Plaintiff to introduce additional evidence before this Court that was not considered by the ALJ. (ECF Nos. 109 & 110.)[9]

On May 22, 2018, Plaintiff filed a Motion for Summary Judgment with respect to Counts

---

[8] The Amended Complaint alleges the following causes of action: IDEA procedural claims (Count One); IDEA substantive claims (Count Two); violations of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.* ("Section 504") (Count Three); violations of the New Jersey Special Education Law, N.J.S.A. 18A:46-1, *et seq.* (Count Four); violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2) (Count Five); violations of Section 504 and a retaliation claim under the ADA (Count Six); negligence against the NJDOE (Count Seven); negligence against Brick (Count Eight); IDEA due process violations against Defendants Russell, Uszenski, and Morgan (Count Nine); violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, *et seq.* ("NJCRA") (Count Ten); violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.* ("NJLAD") (Counts Eleven through Fifteen); common law negligence, gross negligence, deliberate indifference, malice, and *respondeat superior* claims (Count Sixteen); and intentional infliction of emotional distress (Count Seventeen). (ECF No. 44.)

[9] This Court's Order allowed Plaintiff to introduce only Exhibits 1-3, 6-8, 26-27, 33-35, and 37-50. It precluded Exhibits 4-5, 9-25, and 28-32. (ECF No. 110.)

One and Two. (ECF No. 113.)[10] On May 24, 2018, Defendants filed a Partial Motion for Summary Judgment with respect to Counts One and Two. (ECF No. 114.) On July 2, 2018, Defendants filed an Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 117) and Plaintiff filed an Opposition to Defendants' Motion for Partial Summary Judgment. (ECF No. 118). On July 9, 2018, Plaintiff filed a Reply Brief to Defendants' Opposition (ECF No. 119), and on July 27, 2018, Defendants filed a Reply Brief to Plaintiff's Opposition. (ECF No. 120).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

---

[10] Plaintiff's Motion for Summary Judgment indicates it is a "Motion for Summary Judgment as to the Plaintiffs' Appeal of the ALJ's IDEA Ruling," which relates only to Counts One and Two of the Amended Complaint.

"Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.  DECISION

Plaintiff argues Judge Bingham's decision must be reversed because the preponderance of the evidence confirms his findings were erroneous, and Plaintiff is entitled to summary judgment on Counts One and Two as no genuine issues of material fact exist. (ECF No. 113-2 at 4-18.) Specifically, Plaintiff argues summary judgment is warranted as the additional extrinsic evidence admitted by this Court makes it apparent that N.S. was denied a FAPE in the LRE, and the voluminous extrinsic evidence regarding the criminal activities of Defendants Morgan and Uszenski show that N.S. was prejudiced by their scheme to defraud the District. (ECF No. 113-2 at 18-41.) Defendants argue they are entitled to summary judgment on Counts One and Two as Judge Bingham properly determined that Defendants did not commit any procedural or substantive IDEA violations denying N.S. a FAPE in the LRE in developing the November 2012 and May 2013 IEPs. (ECF No. 114-2 at 8-24.)

Once an ALJ makes a determination, any party has the right to appeal such decision in an appropriate state or federal court. *See D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 472 (D.N.J. 1997). The reviewing court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of the party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20

U.S.C. § 1415(i)(2)(C)(i)-(iii). "When deciding an IDEA case, the District Court applies a modified *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). Under this standard, the district court's review over questions of law is plenary. *Carlisle Are Sch. v. Scott P. By and Through Bess P.*, 62 F.3d 520, 528, n.3 (3d Cir. 1995). However, "[f]actual findings from the administrative proceedings are to be considered prima facie correct" and "[i]f a reviewing court fails to adhere to them, it is obliged to explain why." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003) (citations omitted). The party challenging the ALJ's ruling bears the burden of overcoming the presumption that the ALJ's findings were correct. *Andrew M. v. Delaware Cty. Office of Mental Health & Retardation*, 490 F.3d 337, 345 (3d Cir. 2007).

The IDEA includes strict substantive and procedural requirements for school districts to follow in implementing special education plans for students with disabilities. The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs" and to "prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The Supreme Court recently provided a thorough analysis of what is required of school districts in order to satisfy the substantive, FAPE requirement of the IDEA, stating:

> To meet its substantive requirement under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.
>
> The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of

the child's parents or guardians. *Id.* at 208-09. Any review of an
IEP must appreciate that the question is whether the IEP is
*reasonable*, not whether the court regards it as ideal. *Id.* at 206-07.
The IEP must aim to enable the child to make progress. After all,
the essential function of an IEP is to set out a plan for pursuing
academic and functional advancement. *See* 20 U.S.C. §§
1414(d)(1)(A)(i)(I)-(IV) This reflects the broad purpose of the
IDEA, an "ambitious" piece of legislation enacted "in response to
Congress' perception that a majority of handicapped children in
the United States 'were either totally excluded from schools or
[were] sitting idly in regular classrooms awaiting the time when
they were old enough to "drop out."'" *Rowley*, 458 U.S. at 179
(quoting H.R. Rep. No. 94-332, p.2 (1975)). A substantive
standard not focused on student progress would do little to remedy
the pervasive and tragic academic stagnation that prompted
Congress to act.

. . .

Progress through this system is what our society generally means
by an "education." And access to an "education" is what the IDEA
promises. *Rowley*, 458 U.S. at 203. Accordingly, for a child fully
integrated in the regular classroom, an IEP typically should, as
*Rowley* put it, be "reasonably calculated to enable the child to
achieve passing marks and advance from grade to grade." *Id.* at
203-04.

. . .

It cannot be the case that the Act typically aims for grade-level
advancement for children with disabilities who can be educated in
the regular classroom, but is satisfied with barely more than *de
minimis* progress for those who cannot.

When all is said and done, a student offered an educational
program providing "merely more than *de minimis*" progress from
year to year can hardly be said to have been offered an education at
all.

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999-1001 (2017).

While the IDEA does impose procedural requirements upon school districts as well, the

Third Circuit has clarified that "[procedural] compliance is not a goal in itself; rather,

compliance with such procedural requirements is important because of the 'requirements' impact

on students' and parents' substantive rights." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 274 (3d Cir. 2012). A procedural violation "is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *Id.* (citing *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525-26 (2007)).

While a district court is required to consider the factual findings from an administrative proceeding "prima facie correct," *S.H.*, 336 F.3d at 270, Plaintiff presented voluminous extrinsic evidence which was not considered by the ALJ and which creates a genuine issue of material fact concerning the integrity of the effectuation and implementation of N.S.'s IEPs. As such factual disputes regarding Defendants' compliance with the IDEA in developing and implementing N.S.'s IEPs persist, this Court must deny both parties' summary judgment motions.

Most notably, Defendant Russell's statements to the OCPO, which was not considered by the ALJ, demonstrates that N.S.'s matter proceeded to Due Process for, *inter alia*, the elimination of supplemental instruction in his IEP. (ECF No. 101, Ex. 44 at 1643-49). Defendant Russell further indicated that Defendant Morgan was instrumental in altering N.S.'s grades for the 2012-2013 academic year – specifically to give him passing marks which he had not achieved – which certainly calls into question the subsequent development of N.S.'s IEPs, as the child study team presumably operated under the mistaken assumption that N.S. was successful in his classes for that year. (*Id.*) Moreover, Defendant Russell also noted there was no evaluation of N.S.'s "situation" and "needs" before amending his IEP to remove the supplemental instruction. (*Id.*) These revelations certainly call into question Judge Bingham's conclusion that the procedural defects in Brick's development of the IEPs – namely, the exclusion of S.S. – was non-prejudicial and did not deny N.S. a FAPE in the LRE. Indeed, S.S.'s participation in an IEP

development meeting could have raised the concerns highlighted via the introduction of the extrinsic evidence. Additionally, the letter from Dr. Pitera, which the ALJ also failed to consider, provides further evidence that the education N.S. was receiving due to the placement from his IEP was merely *de minimis* at best, and thus afoul of the substantive standard established under the IDEA in *Endrew F.*, 137 S. Ct. at 1001.

Accordingly, the evidence in the record is significant enough to compel this Court to deviate from the findings of the ALJ. Plaintiff has provided sufficient evidence, which was not considered by the ALJ, to create a material question of fact as to whether the development and implementation of N.S.'s IEPs denied N.S. a FAPE in the LRE. As such, Defendants' Motion for Summary Judgment as to Counts One and Two of the Amended Complaint is **DENIED**.

While Plaintiff has proffered evidence sufficient to persuade this Court to deviate from the ALJ's factual findings, there still exist material questions of fact as to whether Brick's deficient process, and Defendant Morgan's tampering with N.S.'s transcript, denied N.S. the right to a FAPE in the LRE. Although Plaintiff introduced evidence tending to suggest a violation of N.S.'s rights, the full evidentiary record has never been considered by a trier of fact. While the extrinsic evidence is sufficient to overturn the ALJ's decision, it does not compel the inevitable conclusion that N.S.'s rights under the IDEA were in fact violated. For instance, while Defendant Russell highlighted the improper termination of supplemental instruction, she also indicated that such instruction did not necessarily benefit N.S. Accordingly, Plaintiff's Motion for Summary Judgment as to Counts One and Two of the Amended Complaint is **DENIED**.

**IV.    CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment on Counts One and Two is **DENIED** and Defendants' Motion for Partial Summary Judgment on Counts One and Two is **DENIED.**


**Date: March 19, 2019**                    */s/ Brian R. Martinotti*
                                    **HON. BRIAN R. MARTINOTTI**
                                    **UNITED STATES DISTRICT JUDGE**